# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

| | |
|---|---|
| KEITH E. SONDERLING,<br>Acting secretary of Labor,<br>United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>ALASKA GOLDMINE LLC, SHELDON<br>MAIER, and JANNE MAIER,<br><br>Defendants. | 4:26-cv-00025-ACP<br><br>**ORDER GRANTING<br>PRELIMINARY<br>INJUNCTION**<br>[Dkt. 5] |

The Maiers own and have leased lands outside of Fairbanks near Pedro Creek where, until recently, they had a federal license to conduct gold mining activities. In 2022, an inspector with the Mine Safety and Health Administration documented several safety violations at one Pedro Creek mine site. The Government then spent several months trying to deliver citations to the Maiers, who were evasive and ultimately refused to address the safety violations. They nonetheless continued operating the mine into 2023 until the District Court issued an injunction saying that "mining activities are strictly prohibited" unless the Maiers complied with applicable law. In response, the Maiers repeatedly told the Government they would stop mining and the case was dismissed.

In 2025, a mine inspector observed what appeared to be new mining activity near the Pedro Creek site. The inspector tried to inspect the site for safety violations, but the Maiers called the State Troopers, who threatened to arrest the inspector for trespassing if he returned. The Government now seeks a preliminary injunction to (1) inspect the Pedro

Creek site and (2) bar miners without required safety training from entering the site. As explained below, the preliminary injunction is **GRANTED**.

## I.  Background

Alaska Goldmine LLC is owned by Sheldon and Janne Maier. (Dkt. 5-2 at 1) The Maiers use portable mining equipment to extract gold from the earth at above-ground mine sites near Pedro Creek, which were formerly licensed by the federal government. (*Id.*) In September 2022, a federal mine inspector conducted an unannounced inspection of the mine after an anonymous tip about unauthorized mining activities. (*Id.*) After accessing the mine via helicopter, the inspector documented several plain view hazards, including: damaged windows on equipment, unguarded machinery, roadways without berms, no flotation devices near water, a 120-volt control box missing knockouts, no traffic signage, and no first aid supplies. (*Id.*) Sheldon Maier arrived during the inspection and refused to allow it to proceed. (*Id.* at 3) He also refused to comply with the Mine Act. (*Id.*) Between September 2022 and June 2023, the inspector tried to contact the Maiers by phone, mail, and in-person visits to deliver citations, but the Maiers never responded to the citations. (*Id.*)

In September 2023, the Mine Administration filed a complaint seeking an injunction against the Maiers. *Su v. Alaska Goldmine LLC*, No. 4:23-cv-19-JMK. The District Court ultimately granted a preliminary injunction barring the Maiers from "conducting mining operations at the Pedro Creek Mine site, until [the] Defendants have complied with" orders issued by the Mine Administration. 2023 WL 7184150, Dkt. 3 (D. Alaska Nov. 1, 2023). Rather than remedy the safety violations, the Maiers told the Government that they were

"not renewing [their] mining license and will not be mining." (Dkt. 5-2 at 6, 9) In 2024, the Government stipulated to dismiss the case and let the injunction dissolve based on the Maiers' assurances. (Dkt. 5-2 at 3)

But in September 2025, there was new mining activity just one mile from the Pedro Creek site addressed in the prior case between these parties. (Dkt. 5-1 at 3) An inspector flew in a helicopter over the Pedro Creek site and "witnessed several heavy machines including an excavator." (*Id.*) The inspector took photos of what he deemed mining activity taking place. (*Id.* at 6-15) A few days later, a second inspector took photos of the site from the ground and left business cards for the Maiers. (*Id.* at 3) State Troopers then called the supervisory inspector, questioned him about the inspection, and "reiterated that if [an inspector] went back to the mine site without a court order [they] would be subject to arrest for criminal trespass." (*Id.* at 4)

The Government filed this lawsuit on April 24, 2026. (Dkt. 1) The instant motion for a preliminary injunction was filed on April 28, 2026. (Dkt. 5) The Defendants were served on May 19, 2026. (Dkt. 7-9) The Maiers were directed to respond to the motion for a preliminary injunction on or before June 2, 2026. (Dkt. 10) No response was filed. But the Defendants answered the complaint on June 9, 2026. (Dkt. 11) And because the Defendants are self-represented, the arguments in the Defendant's answer are considered below as reasons to deny a preliminary injunction.

## II.    Legal Standard

A preliminary injunction is an extraordinary remedy. To obtain one, a party must prove that (1) they are likely to succeed on the merits, (2) they will suffer irreparable harm

without an injunction, (3) the balance of equities favors an injunction, and (4) the injunction will serve the public interest. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). The Ninth Circuit analyzes these factors on a sliding scale. So if a party raises "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff," an injunction may be issued as long as the other two elements are met. *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). And when the Government is a party, the Court may consider the public interest at the same time that it balances the hardships each party stands to suffer. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

### III.    Analysis

The Federal Mine Safety and Health Act was enacted to protect the public, promote health and safety, and prevent mine accidents. *See* 30 U.S.C. § 801(a). The Act requires the Mine Safety and Health Administration to conduct mandatory inspections of every mine in the nation. 30 U.S.C. § 813(a). To make that possible, the Act grants the Mine Administration "a right of entry to, upon, or through any coal or other mine." *Id.* This authority extends only to a "coal or other mine," which is defined at 30 U.S.C. § 802(h)(1) as:

> (A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted . . . , (B) private ways and roads appurtenant to such area, and (C) lands, excavations, . . . structures, facilities, equipment, machines, tools, or other property . . . on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits . . . or used in . . . the milling of such minerals . . . .

The Act applies to each coal or other mine, "the products of which enter commerce, or the operations or products of which affect commerce." 30 U.S.C. § 803.

The Mine Act expressly authorizes courts to award injunctive relief when the law is violated. 30 U.S.C. § 818. As relevant here, the Government may seek an injunction when a mine operator "refuses to permit the inspection of a coal or other mine." *Id.* at § (a)(1)(D).

**A.     The Government is likely to succeed on the merits.**

The Government argues that it is likely to succeed on the merits for two reasons. First, it has jurisdiction over the Pedro Creek site. And second, the Maiers have effectively blocked mine inspections by threatening to have inspectors arrested by State Troopers. The Maiers respond that they are justified in blocking the federal inspection because the Government lacks jurisdiction over the Pedro Creek site. As explained below, the Government is likely to succeed on the merits.

**1.     The Mine Safety and Health Administration likely has jurisdiction.**

The Ninth Circuit has interpreted the "definition of mine very broadly" under the Mine Act. *Cyprus Indus. Min. Co. v. FMSHRC*, 664 F.2d 1116, 1118 (9th Cir. 1981). For example, a "backyard rock quarry [was] within the definition of the statute." *Id.* (citing *Marshall v. Wait*, 628 F.2d 1255, 1258 (9th Cir. 1980)). So too was a "sand and gravel preparation plant" that did not independently extract any raw materials from the ground. *Id.* (citing *Marshall v. Stoudt's Ferry Perparation Co.*, 602 F.2d 589, 592 (3d Cir. 1979)).

Whether or not a narrower reading might otherwise be plausible, the Ninth Circuit has held that the Mine Act, as a remedial statute, must be construed broadly. *Id.*

The Government makes a compelling argument that the Pedro Creek site is a mine under the Mine Act. Until about a year or two ago, the Maiers had a federal license to conduct mining activities just one mile away from the current site. (Dkt. 5-1 at 2 [FMIN 50-02099]) At that location, the Maiers extracted gold using portable mining equipment. (*Id.*) The Maiers relinquished their mining license only *after* the District Court issued an injunction requiring them to comply with the Mine Act. In order to get the case dismissed, the Maiers repeatedly told the Government they "will not be mining" near the site. (Dkt. 5-2) Yet now the Maiers are using "several heavy machines including an excavator" and a trommel to conduct what an inspector deemed "mining activit[ies]." (Dkt. 5-1 at 3) This conduct—happening just one mile from a formerly licensed mine—falls squarely within the definition of a mine in Section 802(h)(1).

The Maier's counterargument is unpersuasive. Notably, they have produced no sworn statements or documentary evidence to support their opposition to the preliminary injunction. While the rules of evidence do not strictly apply to this motion, it is telling that the Maiers have not countered the Government's extensive evidence with anything admissible. *See Herb Reed Enter. v. Fla. Ent. Mgmt., Inc.l*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013). This is especially true because the Maier's have been on notice about their obligations under the Mine Act for nearly four years.

The Maier's main argument is that they "do not extract minerals for sale." (Dkt. 11 at 2) Even if that were true, which seems unlikely given their recent history as licensed

gold miners at a nearby site, that is not a strict requirement under the Mine Act. The definition of "mine" can include purely exploratory activities. For example, the Ninth Circuit has held that merely "driving exploratory drifts in search of a commercial exploitable deposit of" minerals fell within the definition of "mine" even though it did not involve the extraction of minerals. *Cyprus Indus.*, 664 F.2d at 1117. The same is true here. Even if the Maiers have no customers, no contracts, no sales, and no distribution (until they find gold, at least), the Government has presented a credible argument that they are exploring for resources and extracting them from the earth. That would make the Pedro Creek site a mine under the Act.

The Maiers also seem to argue that the Act cannot extend to local or "private land-use activities" under the Commerce Clause. (Dkt. 11 at 2) This argument is barely developed at all. But their view of the Commerce Clause was seemingly rejected in *Gonzalez v. Raich*, 545 U.S. 1 (2005), where the Court concluded that Congress *can* regulate "purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 19. Congress could certainly make that type of finding here given the high likelihood that "privately" mined gold would one day enter the market.

In sum, the Government is likely to prove that it has jurisdiction over the Pedro Creek site because it is just one mile from where the Maiers actively operated a federally licensed gold mine until the District Court forced them to comply with the Mine Act. And the Government provided compelling evidence that mining activity is currently taking

place. The Maiers, on the other hand, provided no meaningful evidence to the contrary. Of course, if the Government inspects the site and determines that the Maiers are not engaged in mining activity, that might change the jurisdictional analysis. But the current record shows that the Government is likely to succeed on this argument.

### 2. The Maiers likely violated the law by refusing to allow an inspection.

The Government is required to conduct mandatory inspections of every mine in the nation. 30 U.S.C. § 813(a). To facilitate inspections, the Act grants the Mine Administration "a right of entry to, upon, or through any coal or other mine." *Id.* And the Government may seek an injunction if a mine operator "refuses to permit the inspection of a coal or other mine." *Id.* at § (a)(1)(D).

That type of refusal is precisely what appears to have happened here. On September 18, 2025 an inspector took photos of the site and left business cards. (Dkt. 5-1 at 3) A few days later, a supervisory mine inspector was contacted by the State Troopers "and questioned about trespassing onto the Pedro Creek mine site." (*Id.* at 4) The inspector "had been accused of criminal trespass by Mr. Maier" and the Trooper "reiterated that if [an inspector] went back to the mine site without a court order [they] would be subject to arrest for criminal trespass." (*Id.*) The Maiers do not contest this series of events at all. And it is self-evident that this constitutes a "refus[al] to permit the inspection of a coal or other mine" made unlawful by the Mine Act. 30 U.S.C. § 813(a)

### B. The Government has established irreparable harm.

This element is more straightforward in the context of the Mine Act because it expressly authorizes the Government to seek an injunction for violations of the Act. 30

U.S.C. § 818. And the Ninth Circuit has held that the "traditional requirements for equitable relief need not be satisfied [when a statute] expressly authorizes the issuance of an injunction." *See U.S. v Estate Pres. Servs.*, 202 F.3d 1093, 1098 (9th Cir. 2000). Whatever the precise scope of this precedent, Congress has clearly signaled that the harm caused by mining at uninspected sites is significant enough to warrant an injunction.

The Government argues that without an injunction, the Maiers "will have effectively prevented MSHA from meeting its Congressional mandate to complete a twice a year safety inspection" of mines under its jurisdiction. (Dkt. 5 at 9) In its view, this harms the Government and any onsite miners subject to the additional risk of working at an uninspected mine. (*Id.*) Also, the "local mining community will suffer irreparable harm because they will be forced to compete with an uninspected mine that has the competitive advantage of not factoring into their costs the safety equipment and training that other registered mines require." The Maiers did not address this issue in their filing. (Dkt. 11)

The Government has satisfied its burden. Indeed, the Government has a fixed amount of time in which to conduct its statutory inspection mandate. 30 U.S.C. § 813(a). Blocking access to a mine directly interferes with that mandate, which is why Congress expressly provided for injunctions in this situation. And to the extent there are any safety violations at the site, miners currently at the Pedro Creek site are bearing unnecessary risk that cannot be reversed. The Maiers are also harming other miner operators by competing with them on unfair terms and skirting the cost of complying with the Mine Act. These are irreparable harms in the context of the Mine Act.

**C.      The public interest and balance of equities favor an injunction.**

The Court must "balance the competing claims of injury" and consider "the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). The injunction must also be in the public interest.

The Government has met its burden under these factors. Importantly, it seeks a limited order that allows the Maiers to continue mining if they comply with the law. The Government merely seeks to (1) complete its Congressionally authorized inspection mandate and (2) bar miners from working until they complete legally required training. Although federal inspections and training requirements are be inconvenient, Congress has chosen to require them and those requirements have not been deemed unconstitutional. The equitable power to issue injunctions is not a license to relieve citizens of their obligation to comply with the law. On balance, the harm to the Government (interference with Congressional mandates) is greater than the harm to the Maiers (inconvenience of inspections and complying with the law).

An injunction is also in the public interest. Inspections and training directly promote the purposes of the Mine Act, which is largely to protect miners and the public. *See* 30 U.S.C. § 801. Even if there are few, or no, employees at the mine, dangerous mining practices pose a danger to surrounding neighbors and the environment. These factors thus favor an injunction.

## IV.    Conclusion

The Government's motion for a preliminary injunction at Docket 5 is **GRANTED**.

- Mine inspectors conducting a lawful mine inspection under the Mine Act are not in violation of state trespass laws in light of 30 U.S.C. § 813(a).

- Under the Mine Act, inspectors from the Mine Health and Safety administration are authorized to enter the Pedro Creek site for lawful inspections. The Defendants may not interfere with such access.

- The Defendants may not permit any miners onto the Pedro Creek site unless they have received all training required under the Mine Act.

IT IS SO ORDERED.

DATED June 15, 2026, at Anchorage, Alaska.

/s/ *Aaron Christian Peterson*
Aaron Christian Peterson
United States District Judge